Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Geraldine Soat Brown | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 4447 | **DATE** | 5/28/2003 |
| **CASE TITLE** | Chicago Prime Packers, Inc. vs. Northam Food Trading Co. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons set out in the attached memorandum opinion and order, plaintiff's motion for summary judgment [59-1] and defendant Northam's motion for summary judgment [57-1] are denied. Enter Memorandum Opinion and Order.
(11) ■ [For further detail see Memorandum Opinion and Order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | MAY 29 2003 | |
| | Notified counsel by telephone. | | date docketed | 80 |
| | Docketing to mail notices. | | 15 docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | FILED FOR DOCKETING 03 MAY 29 PM 12: 22 | 5/28/2003 date mailed notice | |
| MW | courtroom deputy's initials | Date/time received in central Clerk's Office | MW6 mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION



DOCKETED
MAY 2 9 2003

| | |
|---|---|
| **CHICAGO PRIME PACKERS, INC.,** ) | |
| Plaintiff, ) | Cause No. 01 C 4447 |
| ) | |
| v. ) | Magistrate Judge Geraldine Soat Brown |
| ) | |
| **NORTHAM FOOD TRADING CO., et al.** ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Chicago Prime Packers, Inc. ("Chicago Prime" or "Plaintiff") moved for summary judgment against both defendants, Northam Food Trading Co. ("Northam"), and Nationwide Foods, Inc. ("Nationwide"). Northam moved for summary judgment against Chicago Prime. Subsequently, Chicago Prime and Nationwide entered into a settlement, and Count II of Chicago Prime's Amended Complaint, which was its claim against Nationwide, was dismissed with prejudice. [Dkt #79.] Consequently, Chicago Prime's motion for summary judgment against Nationwide is moot. For the reasons set out herein, Plaintiff's Motion for Summary Judgment as to Northam [dkt # 59] is denied. Defendant Northam's Motion for Summary Judgment [dkt # 57] is also denied.

## JURISDICTION

Federal jurisdiction exists in this case because of diversity of citizenship. 28 U.S.C. § 1332. Chicago Prime is a Colorado corporation with its principal place of business in Colorado; Northam is a Canadian corporation with its principal place of business in Montreal, Quebec; and Nationwide

1



is a Delaware corporation with its principal place of business in Illinois.[1] (Am. Compl. ¶¶ 1-3; Northam's Plaintiff's LR Res. ¶¶ 1-3; Nationwide's Plaintiff LR Res. ¶¶ 1-3.) It is not disputed that the amount in controversy exceeds $75,000. The parties have consented to the jurisdiction of a Magistrate Judge. [Dkt ## 16, 37.][2]

## BACKGROUND

Although, as discussed above, Chicago Prime's claim against Nationwide was dismissed, certain facts relating to Nationwide are relevant to the other pending motions. Chicago Prime is a wholesaler of meat products, Northam is also a wholesaler of meat products, and Nationwide (doing business as Brookfield Farms) is a meat processor. (Nationwide's Plaintiff LR Res. ¶¶ 5-7.)

---

[1] The facts are taken primarily from the parties' respective LR 56.1 statements, which are cited herein as follows:

- Defendant Nationwide Foods Inc.'s Combined Response to Statements of Fact and Statement of Additional Facts Precluding Summary Judgment Pursuant to Local Rule 56.1(b)(3) [dkt # 64] ("Nationwide's Northam LR Res."; "Nationwide's Plaintiff LR Res."; "Nationwide's Additional LR Facts");

- Defendant's, Northam Food Trading Company, Response to Plaintiff's, Chicago Prime Packers, Inc. Statement of Uncontested Material Facts Pursuant to Local Rule 56.1(a)(3) [dkt # 66] ("Northam's LR Res.");

- Plaintiff's Response to Defendant Northam Food Trading Company's "Material Facts Claimed to be Undisputed" [dkt # 68] ("Plaintiff's Northam LR Res."); and

- Plaintiff's Response to Brookfield Farms' Statement of Uncontested Material Facts [dkt # 69] ("Plaintiff's Brookfield LR Res.").

[2] Northam previously brought a motion to dismiss [dkt # 4] based on its allegation that the District Court is not the proper forum for this dispute because Northam's purchase order contained a forum selection clause stating that "[a]ny dispute arising from this contract shall be submitted to the ordinary courts of law in the province of Quebec." (Northam's Third [sic] Affirmative Defense ¶ 3-4; Northam's Answer ¶ 5.) That motion was denied by the District Judge. [Dkt # 10.]

Chicago Prime purchased a quantity of pork ribs from Nationwide pursuant to a invoice dated April 6, 2001. (Plaintiff's Brookfield LR Res. ¶ 6; Pl.'s Mot. Sum. J. at 2.) Chicago Prime also contracted to sell 40,500 pounds of pork ribs to Northam. (Northam's Res. to Pl.'s Request to Admit ¶ 1.) Chicago Prime states that it resold the ribs to Northam "within seconds" and without taking physical possession of the ribs. (Pl.'s Mot. Sum. J. at 2.) On or about April 23 or 24, 2001, Brown Brothers Produce Co. Inc. ("Brown Brothers"), acting for Northam, picked up 40,500 pounds of ribs that Nationwide had produced and sold to Chicago Prime from B&B Cold Storage, a storage facility that Nationwide used. (Nationwide's Plaintiff LR Res. ¶ 11; Northam's Res. to Pl.'s Request to Admit ¶¶ 6-7; Northam's Nationwide LR Res. ¶¶ 10, 12.) When Brown Brothers picked up the ribs, it signed a straight bill of lading stating, "property above in apparent good order." (Northam's Res. to Pl.'s Request to Admit ¶¶ 8-9; Nationwide's Plaintiff LR Res. ¶¶ 12-13.) The ribs were loaded from B&B Cold Storage onto a truck belonging to Brown Brothers. (Northam's Nationwide LR Res. ¶ 12.) Brown Brothers delivered the ribs to Beacon Premium Meats ("Beacon") of Robinson, Illinois on April 25, 2001. (Nationwide's Northam LR Res. ¶ 10; Northam's Nationwide LR Res. ¶ 14; Northam's Res. to Pl.'s Request to Admit ¶¶ 21, 25.) Chicago Prime and Nationwide suggest that Beacon is now out of business. (Plaintiff's Brookfield LR Res. ¶ 23.) When the ribs were delivered, Beacon prepared a receiving log noting that the condition of the product was "good with the exception of 21 boxes that had holes gouged in them and the meat inside shows signs of freezer burn." (*Id.* ¶ 16.)[3]

---

[3] Northam's LR Res. ¶¶ 11-16 consist of denials, quasi-denials or partial admissions that do not cite portions of the record supporting the denial, as required by Local Rule 56.1. For example, in response to ¶ 16 of Plaintiff's Statement regarding the bill of lading signed by Beacon, Northam simply repeats its position that the ribs were spoiled when picked up. This court requires compliance with Local Rule 56.1. *See* Court's Case Management Procedures, available on the website for the

On April 30, 2001, Chicago Prime paid Nationwide for the ribs. (Nationwide's Plaintiff LR Res. ¶ 20.) According to Northam, Beacon began processing the ribs on May 4, 2001. (Northam's Mot. Sum. J. ¶ 10.) However, Chicago Prime denies that statement, and Northam does not cite any direct evidence of that fact. (Plaintiff's Northam LR Res. ¶ 10.) On May 4, 2001, Inspector Ken Ward of the United States Department of Agriculture ("USDA") inspected ribs being processed by Beacon, found that they did not look good, and ordered Beacon to stop processing them. (Plaintiff's Northam LR Res. ¶ 11.) On May 23, 2001, Dr. John Maltby of the USDA examined certain of the ribs identified by Ward and ultimately ordered that all of the ribs be destroyed. (Plaintiff's Northam LR Res. ¶¶ 12-14; Northam's Mot. Sum. J. Ex. D, Maltby dep. at 56.) [Dkt # 60.] Dr. Maltby concluded that the ribs in question arrived at Beacon in the spoiled condition. (Plaintiff's Northam LR Res. ¶ 17.) On May 24, 2001, Northam informed Chicago Prime of Dr. Maltby's inspection. (Plaintiff's Northam LR Res. ¶ 21.) On June 18, 2001, Northam informed Chicago Prime that Northam would not pay under the contract. (Id. ¶ 23.) Chicago Prime then filed this lawsuit to recover the contract price from Northam, and subsequently joined Nationwide as a defendant on a second count.

Chicago Prime and Nationwide contest Northam's assertion that the ribs inspected by Inspector Ward and Dr. Maltby were the ribs delivered by Brown Brothers to Beacon. (Plaintiff's Northam LR Res. ¶ 13; Nationwide's Northam LR Res. ¶ 10.) Assuming that they are the same ribs,

---

Northern District of Illinois, www.ilnd.uscourts.gov. *See also Metropolitan Life Ins. Co. v. Johnson,* 297 F.3d 558, 562 (7th Cir. 2002)("[W]e have emphasized the importance of local rules and 'have consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment.'")(internal citation omitted). If a party's failure to follow the rules results in the court adopting a version of the facts that is perhaps not as favorable to that party, that party is bearing the consequence of its own actions. *Id.* at 562.

each party denies that the ribs spoiled while under its ownership or control.

## LEGAL STANDARD

The court may properly grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court must construe all facts and draw all reasonable and justifiable inferences in favor of the nonmoving party. *Id.* at 255.

The court "is not required to draw unreasonable inferences from the evidence." *St. Louis N. Joint Venture v. P&L Enters., Inc.*, 116 F.3d 262, 265 n.2 (7th Cir. 1997). The initial burden is on the moving party to demonstrate, "with or without supporting affidavits," the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met the initial burden, the opposing party must support its contentions with admissible evidence and may not rest upon the mere allegations in the pleadings or conclusory statements in affidavits. *Id.* at 324. The nonmoving party must designate specific facts showing that there is a genuine issue for trial. *Id.* It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which it relies. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

"[N]either 'the mere existence of some alleged factual dispute between the parties'... nor the existence of 'some metaphysical doubt as to the material facts,' is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997)(quoting *Anderson*, 477 U.S. at 247 and *Matushita Electrical Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Thus, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252.

When cross-motions for summary judgment are filed, the same standard is applied to each motion. *Stimsonite Corp. v. NightLine Markers, Inc.*, 33 F. Supp. 2d 703, 705 (N.D. Ill. 1999). This can result in the denial of both motions. *Buttitta v. City of Chicago*, 803 F. Supp. 213, 217 (N.D. Ill. 1992).

## DISCUSSION

Northam and Chicago Prime have filed cross-motions for summary judgment on Count I. Northam alleges that it is not obligated to pay for the ribs because they failed to conform with the contract by virtue of being spoiled at the time they were delivered. (Northam's Mot. Sum. J. at 6.) Chicago Prime argues that Northam waited an unreasonable amount of time to revoke its acceptance or that the ribs spoiled following their transfer to Northam (or those acting on Northam's behalf), and that Northam thus had no grounds to refuse to honor the contract. (Pl.'s Mot. Sum. J. at 3.)

Northam and Chicago Prime dispute what law governs Count I. Northam argues that the contract between it and Chicago Prime is governed by the Convention on the International Sale of Goods ("CISG"). Chicago Prime argues that the transaction is governed by the Uniform Commercial

6

Code ("UCC"). The CISG applies to "contracts of sale of goods between parties whose places of business are in different [nation] States . . . when the [nation] States are Contracting States." *Usinor Indusreel v. Leeco Steel Products Inc.*, 209 F. Supp. 2d 880, 884 (N.D. Ill. 2002)(quoting U.S. Ratification of 1980 United Nations Convention on Contracts for the International Sale of Goods: Official English Text. 15 U.S.C.A. App. Art 1(a) (1997).[4]

The court in the *Usinor* case addressed the issue of whether the UCC is preempted by the CISG. 209 F. Supp. 2d at 884. The court there observed that "when the CISG applies, it pre-empts domestic sales law that otherwise would govern the contract, such as Article 2 of the UCC." *Id.* Under the CISG, "[a]t the time of contracting, the parties have the opportunity to opt-out, and decide that the UCC, or other domestic law, applies." *Id. Accord Ajax Tool Works Inc. v. Can-Eng Mfg. Ltd.*, 01 C 5938, 2003 WL 223187 at *3 (N.D. Ill. Jan. 30, 2003)(Holderman, J.)("In this case, it is undisputed that [plaintiff], an Illinois corporation, and [defendant], an Ontario corporation, are parties whose places of business are in different states and that these states are contracting states. Thus, unless the parties have opted-out, the CISG apples here.") In the present case, Chicago Prime does not allege that the parties opted out of the CISG. Thus, the transaction between Northam and Chicago Prime is governed by the CISG.

Article 38 of the CISG provides:

(1) The buyer must examine the goods, or cause them to be examined, *within as short a period as is practicable in the circumstances*. (2) If the contract involves carriage of the goods, examination may be deferred until after the goods have arrived at their destination. (3) If the goods are redirected in transit or redispatched by the buyer without a reasonable opportunity for examination by him and at the time of the conclusion of the contract the seller knew or ought to have known of the possibility of such redirection or redispatch, examination may be deferred until after the goods

---

[4] Available on Westlaw at 15 U.S.C.A. App., UN Conv. Int. Sale.

have arrived at the new destination. (Emphasis added.)

Article 39 provides:

(1) The buyer loses the right to rely on a lack of conformity of the goods if he does not give *notice to the seller specifying the nature of the lack of conformity within a reasonable time after he has discovered it or ought to have discovered it.* (2) In any event, the buyer loses the right to rely on a lack of conformity of the goods if he does not give the seller notice thereof at the latest within a period of two years from the date on which the goods were actually handed over to the buyer, unless this time-limit is inconsistent with a contractual period of guarantee. (Emphasis added.)

The determination of what period of time is "practicable" is a factual one. In *Shuttle Packaging Systems LLC v. Tsonakis,* 01 C 691, 2001 WL 34046276 (W.D. Mich. Dec. 17, 2001)(Enslen, J.), the court examined what a practicable period of examination was for equipment designed to produce plastic gardening pots. The court observed that

[t]he wording of the [CISG] reveals an intent that buyers examine goods promptly and give notice of defects to sellers promptly. However, it is also clear from the statute that on occasion it will not be practicable to require notification in a matter of a few weeks. For this reason, the outer limit of two years is set for the purpose of barring late notices.

*Id.* at *9. While the court did not ultimately conclude what length of time would be practicable, it considered a number of factors, such as the complexity of the machinery, the method of its delivery, contract provisions that provided for training and ongoing repairs, and the skill of the plaintiff's employees. *Id.*

In addition to the GISG and its caselaw, "[c]aselaw interpreting analogous provisions of Article 2 of the . . . [UCC] may also inform a court where the language of the relevant CISG provision tracks that of the UCC. However, UCC caselaw 'is not *per se* applicable.'" *Delchi Carrier SpA. v. Rotorex Corp.,* 71 F.3d 1024, 1028 (2nd Cir. 1995)(quoting *Orbisphere Corp. v. United States,* 726 F. Supp. 1344, 1355 (Ct. Int'l. Trade 1989)). The UCC provides that goods are

8

accepted when the buyer signifies that the goods are conforming, signifies that he will retain the goods although they are not conforming, fails to make an effective rejection, or takes action inconsistent with the seller's ownership. 810 ILCS 5/2-606(1). All but the last of these provisions are contingent upon a "reasonable opportunity" to inspect the goods. *Id.*

Under the UCC, "[a] buyer who accepts goods that do not conform to the contract... forfeits any remedy unless he notifies the seller of the breach within a reasonable time 'after he discovers or should have discovered' it." *Hydrite Chem. Co. v. Calumet Lubricants Co.*, 47 F.3d 887, 893 (7th Cir. 1995)(quoting 810 ILCS § 5/2-607(3)(a)). What determines the time in which the buyer's duty to inspect must be undertaken depends on the language of the contract and custom and trade usage. *Id.*; *GNP Commodities Inc. v. Walsh Heffernan Co.*, 420 N.E.2d 659, 665 (Ill. App. Ct. 1981).

In the present case, neither Chicago Prime nor Northam has established that there is no genuine issue of material fact to be tried. In the first place, neither party has presented facts demonstrating that Northam's rejection of the meat on May 24, 2001 was or was not pursuant to an examination made "within as short a period as practicable under the circumstances." CISG, Art. 38. In fact, the record presented by the parties does not demonstrate when the meat was first "examined" after it left the B&B Cold Storage. As discussed above, Brown Brothers signed a bill of lading upon loading the ribs into its truck. The parties do not discuss, let alone establish, whether that activity constitutes an examination or a reasonable opportunity for examination under the factual circumstances, as anticipated by the CISG. The first inspection referred to in the parties' statements is that done by Inspector Ward on May 4, 2001.[5] The record before the court fails to establish

---

[5] Nationwide points out that the only evidence of Inspector Ward's inspection is in Dr. Maltby's report, and Nationwide objects to that evidence as inadmissible hearsay. It is unnecessary for this motion to determine whether that statement would be admissible under Fed. R. Evid. 803(8),

9

whether Northam or anyone on its behalf examined the meat prior to that date, or at any other time between May 4, 2001 and Dr. Maltby's inspection on May 23, 2001, although that may be inferred from Dr. Maltby's testimony that Beacon was "reworking" the meat (trying to sort the putrid ribs from the good ones) when he arrived. (Maltby dep. at 45-46.)

The major portion of the evidence submitted by the parties is the report and deposition testimony of Dr. Maltby. Dr. Maltby is a veterinarian who has been employed for the last 18 years by the USDA. (Maltby dep. at 6.) He testified that his job is to supervise other USDA employees who oversee and verify cleanliness in meat packing facilities. (*Id.* at 11.) When he arrived at the Beacon plant on May 23, 2001, Dr. Maltby personally inspected 20 cases that he chose at random out of the 1,350 cases of ribs. (*Id.* at 25, 31.) Dr. Maltby stated in his report, and repeated at his deposition, his conclusion that the ribs were spoiled when they arrived at Beacon. (*Id.* at 33.) He stated that when frozen meat has been left to thaw there is usually "purge," that is, blood that had seeped out and then has refrozen, and there was no evidence of purge on the boxes he saw. (*Id.* at 38, 53.) However, it is possible that a product may have generated purge inside the box that is not visible from the outside of the box. (*Id.* at 106.) Some of the ribs were thawed when he saw them, and some were frozen, but all were in varying degrees of putrification. (*Id.* at 26, 28, 36.) Some of the packaging of the ribs was damaged, possibly allowing exposure of the ribs to the outside. (*Id.* at 30.) Dr. Maltby also stated that the ribs appeared to be from different sources. (*Id.* at 35.) He based that conclusion on the fact that the ribs were of different sizes and in varying degrees of decomposition. (*Id.* at 35-36.) The boxes also had different label numbers on them, indicating

---

because Chicago Prime has admitted that the May 4th inspection took place. (Plaintiff's Northam LR Res. ¶ 11.)

different facility locations of the same company. (*Id.* at 41.) Dr. Maltby admitted that he has no personal knowledge of the ribs' condition when delivered or the conditions under which they were shipped or stored prior to his arrival. (*Id.* at 72-74, 79, 84, 91-92.) He noted that there are "a lot of variables" in how long it would take meat to reach the condition in which he saw these ribs, variables such as the type and size of the meat and the temperature at which it was held. (*Id.* at 43-44.) Dr. Maltby testified that he does not know at what point the ribs spoiled, only that he made a determination that the meat was bad. (*Id.* at 33-34.)

Chicago Prime points to the evidence, discussed above, that Brown Brothers signed a bill of lading stating the ribs were in "apparent good order" and Beacon noted in its receiving log that the "condition of the product" was "good" except for some of the boxes that were "gouged" and some of the meat showing signs of freezer burn. The evidence presented by the parties simply does not eliminate a question of fact about the condition of the ribs when Brown Brothers took them from Nationwide's storage facility or the reasonableness of Northam's notice of rejection.

Chicago Prime's central argument is that "[a] one-month delay in the revocation of acceptance of a perishable commodity such as meat must be considered, as a matter of law, inherently unreasonable. A perishable commodity . . . must be inspected on arrival, when the bill of lading is signed, or the industry can not function." (Pl.'s Mem. Supp. Sum. J. at 5-6). In support of that proposition, Chicago Prime cites *Meat Requirements Coordination, Inc. v. GGO*, 673 F.2d 229 (8th Cir. 1982), in which the appellate court affirmed a judgment in favor of the seller of meat against the buyer for the contract price. In that case, however, the buyer conducted an inspection before taking delivery, and a subsequent inspection by the buyer's buyer showed that the meat was in "excellent condition." *Id.* at 230. Based on those facts, the court found that the meat deteriorated

11

after the buyer accepted it. That the case does not establish any particular time period in which meat must be inspected as a matter of law.

Without citing any authority, Northam argues that meat sold in a frozen state, such as the meat at issue here, can not be analyzed as a "perishable good." (Northam's Reply Further Supp. Def.'s Mot. Sum. J. at 4.) Neither party has provided evidence, such as past practices or custom in the trade, that would support a determination of a reasonable inspection period as a matter of law under the CISG or the UCC. At oral argument on the motions, Chicago Prime's counsel admitted that the only evidence in the record that would allow the court to decide as a matter of law that Northam's notice was not reasonable was the testimony of Dr. Maltby. However, Dr. Maltby's deposition and report do not discuss the custom or practice of buyers and sellers in the meat industry with regard to the inspection of newly-purchased meat, whether frozen or fresh.

Unlike the *Meat Requirements* case discussed above, the materials submitted by the parties here do not eliminate a factual dispute as to what condition the ribs were in when Brown Brothers loaded them on to its truck. Thus, it is impossible to say from the materials submitted what an inspection at that point would have shown. Northam's sole evidence that the ribs were spoiled prior to Northam taking possession is the report and testimony of Dr. Maltby concerning his conclusion that the ribs were spoiled when they arrived at Beacon, presumably on April 25, 2001. However, while Dr. Maltby's testimony *creates* a question of fact preventing summary judgment for Chicago Prime, that testimony is not conclusive enough to *eliminate* any material questions of fact. Also fatal to Northam's motion is the fact that Northam provides no evidence, why, if the ribs were spoiled when they arrived at Beacon, Northam's notice to Chicago Prime a month later was within "a reasonable time after he [the buyer] has discovered it or ought to have discovered it." CISG, Art.

39. Northam simply asserts, without citing any factual support or legal authority, that it could not declare a fundamental breach of the contract until the entire load of meat was condemned. (Northam's Reply Further Supp. Def.'s Mot. Sum. J. at 5.)

Chicago Prime's motion for summary judgment and its response to Northam's summary judgment essentially takes the position that if Northam is correct, Chicago Prime should recover from Nationwide, and if Nationwide is correct, Chicago Prime should recover from Northam. (Pl.'s Mot. Sum. J. at 3.) However, to be entitled to summary judgment against a particular party, Chicago Prime must demonstrate the absence of any genuine issue of material fact about that party's liability. It has failed to do so.

This case is thus distinguishable from the series of summary judgments entered in *Blommer Chocolate Co. v. Bongards Creameries Inc.*, 635 F. Supp. 911, 635 F. Supp. 919, and 644 F. Supp. 234 (N.D. Ill. 1985), cited by Chicago Prime. Bongards produced whey that was contaminated with salmonella, which was sold through two brokers to the plaintiff Blommer, a chocolate products manufacturer. Summary judgment was entered for Blommer against its broker (635 F. Supp. 911), and in favor of the broker against Bongards (635 F. Supp. 919), because the salmonella contamination was definitively traced to the whey that came from Bongards, and further traced back to Bongards' machinery. 635 F. Supp. at 914-916. Here, neither Chicago Prime nor Northam can demonstrate that there is no genuine issue of material fact about which party or entity was responsible for the conditions that caused the ribs to spoil. Thus, summary judgment is not appropriate.

## CONCLUSION

For the foregoing reasons, Chicago Prime's motion for summary judgment and Northam's motion for summary judgment are both denied.

**IT IS SO ORDERED.**

/s/ Geraldine Soat Brown
**GERALDINE SOAT BROWN**
**United States Magistrate Judge**

**DATED: May 28, 2003**