# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Geraldine Soat Brown | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 4447 | **DATE** | 5/21/2004 |
| **CASE TITLE** | Chicago Prime Packers, Inc. vs. Northam Food Trading Co. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set out in the Memorandum Opinion and Order, judgment is entered in favor of plaintiff Chicago Prime Packers, Inc. and against defendant Northam Food Trading Co. in the sum of $178,200.00, plus $27,242.63 representing prejudgment interest calculated at a rate of 5% from May 1, 2001, for a total payment of $205,442.63. Terminate case.

*Geraldine Soat Brown*

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | | 5-24-04 | 108 |
| | Notified counsel by telephone. | | | date docketed | |
| | Docketing to mail notices. | | | docketing deputy initials | |
| | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | | 5/21/2004 | |
| | | | | date mailed notice | |
| GR | courtroom deputy's initials | | | GR | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHICAGO PRIME PACKERS, INC.,   )
      Plaintiff,             )    **Cause No. 01 C 4447**
                       )
      v.               )    **Magistrate Judge Geraldine Soat Brown**
                       )
NORTHAM FOOD TRADING CO., et al.   )
      Defendants.     )

*DOCKETED*
*MAY 2 4 2004*

## MEMORANDUM OPINION AND ORDER

Chicago Prime Packers, Inc. ("Chicago Prime") brought a two count amended complaint against Northam Food Trading Co. ("Northam") and Nationwide Foods, Inc. d/b/a Brookfield Farms ("Brookfield") for breach of contract. [Dkt 22.][1] Chicago Prime and Brookfield subsequently entered into a settlement, and Count II of Chicago Prime's Amended Complaint, which was its claim against Brookfield, was dismissed with prejudice. [Dkt 79, 82.] Thus, the only remaining claim is against Northam for breach of contract.

A bench trial was conducted on December 15, 16 and 17, 2003, and, at the court's request, the parties submitted written post-trial arguments. [Dkt 102.] This court has carefully considered the testimony of the witnesses, the exhibits introduced into evidence and the written submissions of the parties. The following constitutes the court's findings of fact and conclusions of law pursuant to

---

[1] Chicago Prime's original complaint was brought only against Northam and alleged breach of contract and unjust enrichment. [Dkt 1.] Chicago Prime amended its complaint on January 25, 2002, adding Brookfield as a defendant and eliminating its claim for unjust enrichment.

In both the testimony and the exhibits, Brookfield is also referred to as "Nationwide." For purposes of this opinion, this entity will only be called "Brookfield," even if the evidence cited refers to it as "Nationwide."

1

*108*

Rule 52(a) of the Federal Rules of Civil Procedure. To the extent certain findings may be deemed conclusions of law, they shall also be considered conclusions. Similarly, to the extent matters contained in the conclusions of law may be deemed findings of fact, they shall also be considered findings. *See Miller v. Fenton*, 474 U.S. 104, 113-14 (1985). For the reasons set forth below, the court finds that Chicago Prime is entitled to damages in the amount of $178,200.00 plus prejudgment interest in the amount of $27,242.63.

## I.   **Findings of Fact**

Chicago Prime is a Colorado corporation with its principal place of business in Avon, Colorado. (Stip. ¶ 1.)[2] Northam is a Canadian corporation with its principal place of business in Montreal, Quebec, Canada. (Stip. ¶ 2.) Chicago Prime and Northam are wholesalers of meat products. (Stip. ¶¶ 5-6.)

On March 30, 2001, Chicago Prime contracted with Northam to sell 1,350 boxes (40,500 pounds) of government inspected fresh, blast frozen pork back ribs, which Chicago Prime purchased from Brookfield, a meat processor. (Stip. ¶¶ 7-8; Tr. 26-27, 57.)[3] Mike Cline, on behalf of Chicago Prime, and Sandra Burdon, on behalf of Northam, negotiated the terms of the contract. (Tr. 26, 225.) The agreed upon price for the ribs was $178,200.00. (Stip. ¶¶ 9-10), and payment was required within seven days from the date of shipment (Tr. 28, 256-57).

---

[2]   The parties entered into a Stipulation of Facts (cited herein as "Stip."), which was submitted to the court with the Final Pretrial Order. During the trial, the court accepted the stipulated facts as proof in this case. (Tr. 194.)

[3]   Northam filed a Response to Plaintiff's Proposed Findings of Fact (cited herein as "Def.'s Resp. Pl.'s Proposed Findings"). To the extent that Northam admits Plaintiff's proposed findings of fact, the court will accept those facts as findings.

Chicago Prime sent Ms. Burdon a sale confirmation (the "Confirmation"), which she signed and returned to Chicago Prime. (Tr. 226, 242-43; Ex. DX-18, Confirmation at 1.) The Confirmation sets forth a description of the ribs, a price term and the date and location of pick-up.[4] (Confirmation at 1.) However, the Confirmation does not include a notice term or an inspection term. Chicago Prime also produced an invoice for the sale (the "Invoice"), which states that "[n]o claim will be allowed unless [Chicago Prime] is notified upon receipt of the product." (Ex. JX-1, Invoice at 1.)[5] Neither party signed the Invoice. Although Chicago Prime faxed the Invoice to Northam, it admittedly did not transmit the fax until after the ribs had been received by Northam. (Tr. 28, 42-43, 264.)

On April 24, 2001, Brown Brother's Trucking Company ("Brown Brother's"), acting on behalf of Northam, picked up 40,500 pounds of loin back ribs from B&B Pullman Cold Storage ("B&B"), a cold-storage facility used by Brookfield.[6] (Stip. ¶¶ 12-13; Tr. 30, 63, 198.) Chicago Prime never actually possessed the ribs. (Tr. 56, 147.) When Brown Brother's picked up the ribs, it signed a straight bill of lading (the "First Bill of Lading"). (Def.'s Resp. Pl.'s Proposed Findings ¶ 12; Ex. JX-2, First Bill of Lading at 1.) By signing the First Bill of Lading and making no specific notations to the contrary, Brown Brother's acknowledged that the ribs were "in apparent good order." (Id.) However, the First Bill of Lading also indicates that the "contents and condition of contents

---

[4] The date and location of pick-up were subsequently changed (Tr. 198, 226-27), but those changes are irrelevant to the current dispute. (Tr. 264.)

[5] The parties submitted twelve joint exhibits (cited herein as "Ex. JX-__") with the Final Pre-Trial Order, all of which were admitted into evidence. (Tr. 16-17.) However, Ex. JX 5 was withdrawn from the evidence by agreement of the parties. (Tr. 240-41.)

[6] According to Ms. Burdon, Northam actually contracted with CH Robinson to transport the shipment of ribs, and CH Robinson subcontracted with Brown Brother's. (Tr. 254, 259.)

of packages [were] unknown" at the time of receipt. (First Bill of Lading at 1.)

On April 25, 2001, Brown Brother's delivered the ribs to Northam's customer, Beacon Premium Meats ("Beacon"). (Def.'s Resp. Pl.'s Proposed Findings ¶ 13.) At the time of receipt, Beacon signed a bill of lading (the "Second Bill of Lading") acknowledging that it had received the ribs "in apparent good order," except for "21 boxes [that] were gouged and [the] meat in [those boxes] show[ed] signs of freezer burn." (*Id.* ¶ 14; Ex. JX-3, Second Bill of Lading at 1.)[7] Beacon made a similar notation regarding the condition of the ribs on its receiving log. (Def.'s Resp. Pl.'s Proposed Findings ¶ 16; Ex. JX-4, Receiving Log at 1.)

Chicago Prime paid Brookfield for the ribs. Under the terms of the contract, Northam was obligated to pay Chicago Prime for the ribs by May 1, 2001. (Tr. 28, 257.) Chicago Prime demanded payment from Northam on May 2, 2001. (Tr. 204.) During her testimony, Ms. Burdon admitted that, on May 1, 2001, Northam had no basis on which it could withhold payment to Chicago Prime. (Tr. 257.) In fact, Ms. Burdon thought that a check had been sent to Chicago Prime prior to May 1, 2001, but she subsequently discovered that the check had not been mailed. (Tr. 257.)

On May 4, 2001, Beacon began "processing" a shipment of pork loin ribs and noticed that the product appeared to be in an "off-condition." (Ex. JX-8, Dr. Maltby's Report at 1.) Beacon contacted Inspector Ken Ward of the United States Department of Agriculture ("USDA") to examine the product. (*Id.*) Inspector Ward inspected the ribs at the Beacon facility, found that the meat "did not look good," and ordered Beacon to stop processing the product. (Stip. ¶ 16.) Inspector Ward then placed a "U.S. Retained" tag on the product, on which he noted: "yellow, green, temp[erature]

---

[7] Neither party has alleged that the damage noted by Beacon on April 25, 2001 was in any way related to the alleged damage at issue in this case. (Pl.'s Proposed Findings ¶ 14.)

abused, spoiled." (Ex. JX-9, U.S. Retained Tag; Tr. 287.) Those ribs were then placed in Beacon's freezer. (Stip. ¶ 17.)

That same day, Chicago Prime and Northam learned of a potential problem with the ribs. (Tr. 44-45, 204, 243; Stip. ¶ 14.) Dave Phillips, the purchasing agent for Beacon, contacted Mr. Cline regarding a potential problem with the meat. (Tr. 38-39, 44-45, 204.) Mr. Cline then contacted Ms. Burdon, who in turn contacted Mr. Phillips. (Tr. 38-39, 46, 204, 228, 243-44.)

Inspector Ward returned to Beacon on May 7 and May 8 and examined the product in both its frozen and thawed state. (Dr. Maltby's Report at 1-2.)[8] Mr. Ward also contacted his circuit supervisor, Dr. John Maltby, to conduct an on-site inspection of Beacon and investigate the condition of the meat. (Tr. 275, 278-80.)

On May 14, 2001, Beacon rejected the shipment of ribs. (Ex. DX-16, Letter from Beacon to Brookfield.) That same day, Ron Sills, President of Chicago Prime, sent a letter to Ms. Burdon indicating that the first complaint made to Chicago Prime about the condition of the ribs was on May 4, 2001 – 10 days after Northam received the product. (Tr. 145, 247; Ex. JX-7(A-B), Letter from R. Sills to S. Burdon.) On May 17, 2001, Ms. Burdon sent an e-mail to Mr. Sills indicating that

---

[8] Chicago Prime previously moved to strike, based on inadmissible hearsay, the portion of Dr. Maltby's report containing information provided by Inspector Ward to Dr. Maltby. [Dkt 84.] On July 22, 2003, that portion of Chicago Prime's motion was denied under Federal Rule of Evidence 803(8), which creates an exception to the hearsay rule for reports of public offices or agencies in certain situations. *Chicago Prime Packers, Inc. v. Northam Food Trading Co.*, No. 01 C 4447, 2003 WL 21704439 at *3 (N.D. Ill. July 22, 2003) (Brown, M.J.). That opinion, however, questioned whether the information that was communicated by Inspector Ward to Dr. Maltby could be admitted for the truth of Inspector Ward's statements as opposed to forming a basis for Dr. Maltby's conclusions. *Id.* at *4 n. 2. Since Inspector Ward did not testify in this case, his statements to Dr. Maltby cannot be admitted for the truth of the matter asserted. Accordingly, unless stipulated to by the parties, information regarding Inspector Ward's actions or observations at Beacon is provided here only as background and has not been relied upon by the court as a basis for its conclusions.

Northam must investigate the nature of the complaints received. (Tr. 249; Ex. JX-7(E), May 17, 2001 E-mail Correspondence.) In response, Mr. Sills sent Ms. Burdon an e-mail denying any responsibility and demanding prompt payment, by wire, in full. (May 17, 2001 E-mail Correspondence.)

On May 23, 2001, Dr. Maltby conducted an on-site inspection at Beacon's facility. (Stip. ¶ 17; Tr. 279.) Notwithstanding Beacon's rejection of the ribs on May 14, when Dr. Maltby arrived at Beacon on May 23, the Beacon workers were in the process of "reworking" the ribs.[9] (Dr. Maltby's Report at 2.) Dr. Maltby reviewed Beacon's shipping records and temperature logs from the relevant time period, examined approximately 20 cases of ribs, and prepared a written report. (Stip. ¶ 17; Def.'s Resp. Pl.'s Proposed Findings ¶ 33; Tr. 281-83, 287-88; Dr. Maltby's Report.) In reviewing Beacon's records and logs, Dr. Maltby did not find any "anomalies" or "gaps." (Tr. 282, 287.)

According to Dr. Maltby's report, Beacon gave him two pallets of frozen ribs untouched by Beacon ("Intact Pallets"), two pallets of ribs that Beacon had tempered and product that Beacon had re-worked. (Dr. Maltby's Report at 2.) Dr. Maltby found that one of the Intact Pallets contained the legend and establishment number 876A over the number 876 and also contained the code date of 0332. (*Id.*) The 876 number is the establishment number for Brookfield. (Tr. 112-13.) Looking inside one of the Intact Pallet boxes, Dr. Maltby found approximately 8 to 12 ribs stacked both horizontally and vertically, and each rib was wrapped in plastic wrap and frozen together as a unit or frozen individually. (Dr. Maltby's Report at 2.) The individually frozen ribs were the ones that

---

[9] Dr. Maltby defined the term "re-worked" as "trying to salvage what was good from what was bad by separating the two." (Tr. 284.)

were putrid. (*Id.*) In another box (presumably from one of the Intact Pallets), Dr. Maltby saw an individually frozen rib that was putrid underneath some other ribs that appeared to be "good" ribs frozen as a unit. (*Id.* at 2-3.)

Dr. Maltby then examined samples of thawed product that Beacon had attempted to re-work in its frozen state. (*Id.* at 3.) Among those ribs, Dr. Maltby found putrid, green, slimy ribs that had passed through the re-working process. (*Id.*) Dr. Maltby also looked at some of the product that was condemned by Inspector Ward and reported that, "[e]ven though it was frozen, the product was obviously putrid as it was green, slimy and had an offensive odor even frozen." (*Id.*) Dr. Maltby found no signs of temperature abuse because "there was no purge or blood soaked boxes throughout the entire load." (*Id.* at 2.) Dr. Maltby ultimately concluded that the product that he inspected was rotten, that it arrived at Beacon in a rotten condition, and it appeared to be assembled from different locations. (*Id.* at 3; Tr. 288.) Dr. Maltby also determined that there was no opportunity for salvage and all of the product should be condemned. (Dr. Maltby's Report at 3; Stip.¶¶ 18-19.)

On May 23, 2001, the USDA issued a Notice of Receipt of Adulterated or Misbranded Product regarding the 1,350 boxes of pork loin back ribs and the entire shipment was condemned. (Stip. ¶¶ 19-20; Ex. JX-6, USDA Notice at 1.) On May 24, 2001, Northam informed Chicago Prime of the results of Dr. Maltby's inspection. (Stip. ¶ 24; Ex. JX-7(F), May 24, 2001 Fax from S. Burdon to M. Cline.) Chicago Prime continued to demand payment for the ribs. (Stip. ¶ 25.) Mr. Cline and Ms. Burdon exchanged e-mail communications regarding the spoiled ribs again on May 29, 2001. (Tr. 252; Ex. JX-7(K), May 29, 2001 E-mail Correspondence.) On June 18, 2001, Northam advised Chicago Prime of the destruction of the ribs. (Tr. 253; Ex. JX-7(J), June 18, 2001 Fax from S. Burdon to M. Cline.)

*Processing and Storage of the Ribs Prior to the Transfer to Northam*

When a pork loin is processed at Brookfield, it is broken into various segments, one of which is the back rib. (Tr. 125.) After processing, Brookfield packages loin back ribs "flat" (horizontally), layer by layer, in 30-pound boxes (Tr. 60, 127.) The ribs are then placed in a blast freezer and, subsequently, transferred to an outside freezer until they are shipped. (Tr. 60, 129-30.) During processing and storage, back ribs are kept below 40 degrees. (Tr. 60, 181.)

The ribs at issue here were stored in as many as three different locations – Brookfield's own blast freezers, B&B and Fulton Market Cold Storage ("Fulton"). (Tr. 104.) According to Brookfield's temperature logs and quality control records, the ribs were maintained at acceptable temperatures and were processed and maintained in accordance with Brookfield's procedures. (Tr. 67; Ex. PX-14, Quality Control & Temperature Audit Records.)[10] From at least March 19, 2001 through April 23, 2001, B&B also monitored and recorded the temperatures in its storage freezers on a daily basis. (Tr. 136-38; Ex. JX-11, B&B Temperature Records.) Those records indicate that the ribs were stored at or below acceptable temperatures during the entire time they were in B&B's possession. (Tr. 138-39.) No evidence was presented regarding the relevant temperature or quality control records at Fulton.

---

[10] During cross-examination, Steven Moughler, the Director of Quality Assurance at Brookfield, admitted that some of the temperatures recorded on Brookfield's temperature logs were "in excess of 40 degrees." (Tr. 58, 100.) In fact, the Plant Temperature Audit Sheets for Brookfield showed several recorded temperatures in excess of 40 degrees but below 65 degrees, primarily on the receiving and shipping docks, which have target temperatures of "45 to 50 degrees." (Quality Control & Temperature Audit Records.) There is no indication, however, that those recorded temperatures altered Mr. Moughler's conclusion that the ribs were maintained at acceptable temperatures while in Brookfield's possession, and Northam did not present any evidence that those recorded temperatures would cause the putrid condition of the ribs.

## II.   Conclusions of Law

### *Jurisdiction and Venue*

This court has subject matter jurisdiction under 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount of controversy, exclusive of interests and costs, is in excess of $75,000. (Pre-Trial Order ¶ 1.) The parties have consented to the jurisdiction of a Magistrate Judge. [Dkt 16, 37.] Venue is proper because the action arises from a transaction that occurred in this District. (Stip. ¶ 4.)

### *Convention on the International Sale of Goods*

This court previously determined that the transaction between Chicago Prime and Northam was governed by the Convention on the International Sale of Goods ("CISG"), a self-executing agreement between the United States and other signatories, including Canada. *See Chicago Prime Packers, Inc. v. Northam Food Trading Co.*, No. 01 C 4447, 2003 WL 21254261 at *3 (N.D. Ill. May 29, 2003) (Brown, M.J.); *Delchi Carrier SpA v. Rotorex Corp*, 71 F.3d 1024, 1027-28 (2nd Cir. 1995). Because there is virtually no American caselaw under the CISG, courts look to its language and to the "general principles" upon which it is based. *Delchi Carrier SpA*, 71 F.3d at 1027-28 (citing CISG, Art. 7(2)). *See also Usinor Industeel v. Leeco Steel Prods., Inc.*, 209 F. Supp. 2d 880, 884 (N.D. Ill. 2002) (stating that "federal caselaw interpreting and applying the CISG is scant"). The Convention directs that its interpretation be informed by its "international character and . . . the need to promote uniformity in its application and the observance of good faith in international trade."

*Delchi Carrier SpA*, 71 F.3d at 1028 (quoting CISG, Art. 7(1)).[11] Case law interpreting analogous provisions of Article 2 of the Uniform Commercial Code ("UCC") may also inform the court where the language of the relevant CISG provisions tracks that of the UCC. *Id.* However, UCC caselaw "is not *per se* applicable." *Id.* (quoting *Orbisphere Corp. v. United States*, 726 F. Supp. 1344, 1355 (Ct. Int'l Trade 1989)).

Under the CISG, "[t]he seller must deliver goods which are of the quantity, quality and description required by the contract," and "the goods do not conform with the contract unless they . . . are fit for the purposes for which goods of the same description would ordinarily be used." CISG, Art. 35. The CISG further states that "[t]he seller is liable in accordance with the contract and this Convention for any lack of conformity." CISG, Art. 36.

Turning to the buyer's obligations, Article 38 provides:

(1) The buyer must examine the goods, or cause them to be examined, within as short a period as is practicable in the circumstances.

(2) If the contract involves carriage of the goods, examination may be deferred until after the goods have arrived at their destination.

(3) If the goods are redirected in transit or redispatched by the buyer without a reasonable opportunity for examination by him and at the time of the conclusion of the contract the seller knew or ought to have known of the possibility of such redirection or redispatch, examination may be deferred until after the goods have arrived at the new destination.

CISG, Art. 38. Furthermore, Article 39 provides:

(1) The buyer loses the right to rely on a lack of conformity of the goods if he

---

[11] In light of the Convention's directive to observe the CISG's international character and the need to promote uniformity in its application, this court has looked to foreign caselaw for guidance in interpreting the relevant provisions of the CISG in this case. *See* foreign cases cited *infra*. Although foreign caselaw is not binding on this court, it is nonetheless instructive in deciding the issues presented here.

does not give notice to the seller specifying the nature of the lack of conformity within a reasonable time after he has discovered it or ought to have discovered it.

(2)    In any event, the buyer loses the right to rely on a lack of conformity of the goods if he does not give the seller notice thereof at the latest within a period of two years from the date on which the goods were actually handed over to the buyer, unless this time-limit is inconsistent with a contractual period of guarantee.

CISG, Art. 39.


## Issues Before the Court

Under Article 25 of the CISG, "[a] breach of contract committed by one of the parties is fundamental if it results in such detriment to the other party as substantially to deprive him of what he is entitled to expect under the contract . . . ." CISG, Art. 25. In this case, it is undisputed that the parties entered into a valid and enforceable contract for the sale and purchase of pork loin ribs, Chicago Prime transferred a shipment of pork loin ribs to a trucking company hired by Northam, Northam has not paid Chicago Prime for the ribs pursuant to the contract, and Chicago Prime has suffered damages in the amount of the contract price. Therefore, Chicago Prime has established the essential elements for a breach of contract claim.

Northam asserts, however, that the ribs were spoiled at the time of transfer and, as a result, it is relieved of its duty to pay under the contract. (Def.'s Answer and Affirm. Defenses at 4-5; Def.'s Post-Trial Brief at 2-7, 13.) The burden is on Northam to establish non-conformity. *Weir v. Crown Equipment Corp.*, 217 F.3d 453, 466 (7th Cir. 2000) (Ripple, J., dissenting) (when an affirmative defense is raised, the burden is on the defendant to establish its elements); *see also Abatron, Inc. v. Fulton Contracting Co.*, 530 N.E.2d 76, 81 (Ill. App. 2d Dist. 1988) (court held that the buyer did not

sustain its burden of proving the product was nonconforming). The evidence is evaluated in light of that burden.

### 1. Northam has failed to prove that the ribs were non-conforming at the time of transfer.

To carry its burden, Northam relies primarily on the report and testimony of Dr. Maltby. (Def.'s Post-Trial Brief at 5-7.) As set forth above, Dr. Maltby concluded that the product he inspected arrived at Beacon in a rotten condition. (Dr. Maltby's Report at 3.) However, Chicago Prime points out several problems with Northam's reliance on Dr. Maltby's conclusion. (Pl.'s Post-Trial Brief at 2.) Most significantly, neither Dr. Maltby nor anyone else could confirm that the meat Dr. Maltby inspected was in fact the product that was sold to Northam by Chicago Prime (Tr. 293), and evidence was produced at trial to suggest that they were not the same ribs. Even though the rib boxes were labeled with Brookfield establishment numbers, the evidence showed that Beacon had purchased and received other loads of ribs originating from Brookfield prior to April 25, 2001. (Tr. 112, 262; Dr. Maltby's Report at 2.) Furthermore, some of the ribs examined by Dr. Maltby (from one of the Intact Pallets) were stacked both horizontally and vertically. (Tr. 300.) Brookfield packages its loin back ribs only horizontally. (Tr. 127-28.) Dr. Maltby had no personal knowledge of how or where the meat was stored from April 25, 2001 to May 23, 2001, and the first time any government inspector viewed the meat was on May 4, 2001. (Tr. 306.) According to Dr. Maltby, loin back ribs, if kept at room temperature, could spoil in five to seven days. ( *Id.*) Surprisingly, Northam did not present any witness affiliated with Beacon to address those issues.

Chicago Prime produced evidence, through the testimony of Steve Moughler, Brian

Boomsma, and USDA Inspector Scott Elliott, that the ribs delivered by Brookfield were processed and stored in acceptable conditions and temperatures from the time they were processed until they were transferred to Northam on April 24, 2001. (Tr. 59, 62-68, 77-78, 135-39, 181-88). Mr. Moughler, Brookfield's Director of Quality Assurance, testified that the ribs were appropriately processed and maintained in acceptable temperatures while at Brookfield; and no other meat products that were processed and stored at the same time and under the same conditions as the ribs were found to be spoiled or objectionable. (Tr. 58, 67, 77-78.) Furthermore, Inspector Elliott, who was assigned to the Brookfield facility from October 2000 through July 2001, testified that, during the relevant time period, he did not notice any "bad meat." (Tr. 181, 188-89.) Finally, Mr. Boomsma, President of Dutch Farms, which owns B&B, testified that, based on a review of the temperature records of B&B, "we did what we were supposed to do" from the time the ribs were received by B&B and picked up by Brown Brother's. (Tr. 133, 135, 138-39; B&B Temperature Records.)

Northam attempts to discredit the testimony of Mr. Moughler and Mr. Boomsma by pointing out deficiencies in the record keeping of Brookfield and B&B during the relevant time period. (Def.'s Post-Trial Brief at 2-5.) But, even if the records are incomplete, there is nothing in the evidence demonstrating that Brookfield, B&B or Fulton did anything improper with respect to the ribs or that the ribs were spoiled prior to being transferred to Northam. Northam argues that Chicago Prime has "utterly failed to establish that the ribs were damaged while at Beacon." (*Id.* at 7.) That argument ignores the fact that Northam carries the burden of proving that the ribs were non-conforming at the time of receipt.

Notwithstanding Dr. Maltby's testimony, Northam has failed to carry its burden of demonstrating that the ribs that are the subject of this lawsuit were spoiled at the time Brown

13

Brother's took possession of them on April 24, 2001. In addition, even if the ribs were spoiled at the time of transfer, Northam has failed to prove that it examined the ribs, or caused them to be examined, within as short a period as is practicable under the circumstances, or that it rejected or revoked its acceptance of the ribs within a reasonable time after it discovered or should have discovered the alleged non-conformity.

### 2. Northam failed to prove that it examined the ribs, or caused them to be examined, within as short a period as is practicable under the circumstances.

Although Chicago Prime's assertion that Northam was obligated to examine the ribs when Brown Brother's received them on April 24, 2001 is not supported by the contract or the CISG, Northam has failed to present evidence to carry its burden of demonstrating that it examined the ribs, or caused them to be examined, within as short a period as is practicable under the circumstances.

Northam is correct that "there were no contractual [terms] requiring inspection upon delivery." (Def.'s Post-Trial Brief at 10.) Although the Invoice stated that "[n]o claim will be allowed unless [Chicago Prime] is notified upon receipt of product," the Invoice was never signed by the parties, and Chicago Prime did not fax the Invoice to Northam until after Northam had received the product. (Tr. 42-43; Invoice at 1.) Furthermore, the First Bill of Lading specifically states that, at the time of receipt, the "contents and condition of contents of packages [were] unknown." (First Bill of Lading at 1.) On the other hand, Ms. Burdon's testimony that Northam generally requires that claims with regard to the quality or quantity of goods be brought within 10 days of the date of delivery is clearly insufficient to prove that such a term was incorporated in the contract between Chicago Prime and Northam.

14

When an issue is not addressed by the contract, the provisions of the CISG govern. *Ajax Tool Works, Inc. v. Can-Eng Mfg. Ltd.*, No. 01 C 5938, 2003 WL 223187 at *3 (N.D. Ill. Jan. 30, 2003) (Holderman, J.) ("The CISG does not preempt a private contract between parties; instead, it provides a statutory authority from which contract provisions are interpreted, fills gaps in contract language, and governs issues not addressed by the contract."). Because the contract at issue did not contain an inspection provision, the requirement under the CISG that the buyer examine the goods, or cause them to be examined, "within as short a period as is practicable in the circumstances" is controlling. CISG, Art. 38(1). Decisions under the CISG indicate that the buyer bears the burden of proving that the goods were inspected within a reasonable time. *See, e.g., Fallini Stefano & Co. s.n.c. v. Foodic BV*, No. 900336, Arrondissementsrechtbank Roermond, Netherlands (Dec. 19, 1991), UNILEX 1991.[12] The determination of what period of time is "practicable" is a factual one and depends on the circumstances of the case.

In *Shuttle Packaging Sys., L.L.C. v. Tsonakis*, No. 01 C 691, 2001 WL 34046276 (W.D. Mich. Dec. 17, 2001) (Enslen, J.), the court discussed the practicable period of examination for equipment designed to produce plastic gardening pots. The court observed:

> The wording of the [CISG] reveals an intent that buyers examine goods promptly and give notice of defects to sellers promptly. However, it is also clear from the statute that on occasion it will not be practicable to require notification in a matter of a few weeks. For this reason, the outer limit of two years is set for the purpose of barring late notices.

*Id.* at *9. While the court did not ultimately conclude what length of time would be practicable, it

---

[12] That decision and the other foreign decisions cited in this opinion have not been translated into English and, as a result, cannot be cited directly by this court. Instead, this court relies upon the detailed abstracts of those decisions provided by UNILEX, an "intelligent database" of international case law on the CISG. All of the abstracts cited herein are available at http://www.unilex.info/.

considered a number of factors, such as the complexity of the machinery, the method of its delivery, the need for training and ongoing repairs with respect to the machinery, and the skill of the plaintiff's employees. *Id.*

A number of foreign courts have also addressed the question of how much time a buyer has to examine goods or discover defects under the CISG. *See* Louis F. Del Duca & Patrick Del Duca, *Selected Topics under the Convention on International Sale of Goods (CISG)*, 106 Dick. L. Rev. 205, 220-27 (Summer 2001) (collecting cases). In one German case, for example, a buyer lost the right to rely on lack of conformity by failing to promptly inspect ham delivered by the seller or give notice of the ham's nonconformity within a reasonable time. *See* (Parties not reported), No. 2 C 395/93, Amtsgericht Riedlingen, Germany (Oct. 21, 1994), UNILEX 1994. The court found that because the alleged defect (inadequate seasoning) was easily recognizable, the buyer should have examined the goods within three days of delivery. *Id.* *See also* Danielle Alexis Thompson, *Translation of Oberlandesgericht Karlsruhe Decision of 25-06-1997 Including Commentary – Buyer Beware: German Interpretation of the CISG has Lead to Results Unfavorable to Buyers*, 19 J.L. & Com. 245, 249-50 (Spring 2000) ("The 'median value' for this [inspection] time frame for examination according to Article 38(1) of the CISG can, even regarding durable goods, be based on a three to four day time period. This figure can be corrected upward or downward as the particular case requires.").

In a case dealing with insufficient quantity as a defect, another German court held that under Article 38, examination of the quantity of items delivered must be done immediately at the place of performance of the obligation or at the agreed destination. *See* (Parties not reported), No. 54 O 644/94, Landgericht Landshut, Germany (April 5, 1995), UNILEX 1995. According to the German court, the Swiss buyer of German clothing should have examined or caused the goods to be examined

as soon as they arrived at the agreed destination. *Id.* The court found that examination of the quantity of the items delivered more than a week after delivery was unreasonable under the circumstances. *Id. See also* Alessandro Rizzieri, *Decision of the Tribunal of Vigevano, Italy, July 12, 2000*, 20 J.L. & Com. 209, 217 (Spring 2001) (stating that "according to the drafters of the Convention, goods are normally to be examined at the time of receipt, which will usually permit the buyer to determine quickly whether the goods are defective, and thus notice to the seller of any lack of conformity will follow shortly after the goods are delivered") (citation omitted).

As mentioned above, Section 3 of Article 38 of the CISG provides that "[i]f the goods are redirected in transit or redispatched by the buyer without a reasonable opportunity for examination by him and at the time of the conclusion of the contract the seller knew or ought to have known of the possibility of such redirection or redispatch, examination may be deferred until after the goods have arrived at the new destination." CISG, Art. 38(3). In this case, Chicago Prime knew, or ought to have known, that the ribs would be redirected or redispatched after receipt because Chicago Prime knew that Northam was only a "trading company," which Ron Sills defines as a company that buys and sells meat, but does not own any facilities, brick and mortar, or trucks. (Tr. 146.) Thus, under the CISG, examination of the ribs could have been deferred until after they arrived at Beacon.

It is notable, however, that Northam did not present any testimony or evidence as to why the ribs or a portion of the ribs were not and could not have been examined by Northam, Beacon, or someone acting on their behalf when the shipment was delivered to Beacon on April 25 or within a few days thereafter. Northam states that "[t]he first problem with the ribs was noted on Thursday, May 3, 2001, when some of the ribs were removed from the freezer for thawing." (Def.'s Post-Trial Brief at 9.) However, there is no evidence that Beacon examined or inspected the ribs on May 3,

2001. Dr. Maltby's Report, which Northam cites for support, states only that the product was removed from the freezer and placed on the processing floor on the afternoon of May 3, 2001. (Dr. Maltby's Report at 1.) Furthermore, the parties have stipulated that Beacon noticed that the meat was "off condition" when its employees "re-inspect[ed]" the meat on May 4, 2001. (Stip. ¶ 14.) There is no evidence that an inspection took place at any time prior to the May 4 processing.

Northam points out that the ribs were wrapped and shipped in sealed non-transparent cartons or packages that are either white or brown. (Def.'s Post-Trial Brief at 7) (citing Tr. 107). However, according to Dr. Maltby, nothing would have precluded a Beacon representative from opening and inspecting the boxes of ribs that were received on April 25, 2001. (Tr. 304.) Similarly, Mr. Gleason testified: "There is nothing to preclude a customer from receiving our box, opening the box, inspecting the ribs . . . ." (Tr. 130.) Although Dr. Maltby stated that the USDA would not want Beacon trying to rebox or process the product until someone from the USDA was there to inspect it (Tr. 304), there is no evidence that Beacon was waiting for a USDA inspector before opening the meat. Northam simply did not present any evidence indicating why the boxes or at least enough of the boxes to constitute a reasonable inspection could not have been opened and examined when they arrived at Beacon or shortly after arrival.[13]

Based on Mr. Moughler's testimony that most meat products can be inventoried for more than three months (Tr. 111), Northam claims that it should not have been required to examine the frozen ribs in the same period of time as other perishables. (Def.'s Post-Trial Brief at 9.) However, the fact

---

[13] It appears that Beacon examined at least some of the ribs contained in the 21 boxes that were "gouged" because it indicated on the Second Bill of Lading that the meat showed "signs of freezer burn." (Second Bill of Lading at 1.) However, Northam has never argued nor suggested that Beacon, acting on Northam's behalf, examined the shipment of meat when it arrived, and none of the meat was rejected on that basis.

that goods are frozen when delivered does not exempt a buyer from making a timely examination. In *Fallini Stefano & Co., supra*, the court held that, although the cheese ordered by the buyer had been delivered frozen, the buyer was not exempt from the duty to make a timely examination. According to the court, the buyer could have defrosted a portion of the cheese and discovered the non-conformity. *Id.* Significantly, in this case, according to Dr. Maltby, Northam did not need to defrost the product to see that it was putrid. In his report, Dr. Maltby stated that, even in a frozen state, the product was obviously putrid because it "was green, slimy and had an offensive odor . . . ." (Dr. Maltby's Report at 3; Tr. 305.) At trial, Dr. Maltby testified that if an employee of Beacon, on April 25, had opened the boxes and saw, smelled and touched the ribs that he did on May 23, "it would have been very clear and obvious" that they were putrid. (Tr. 305.)

Accordingly, Northam has failed to demonstrate that it examined the ribs, or caused them to be examined within as short a period as is practicable under the circumstances.

3. **Northam also failed to prove that it gave notice to Chicago Prime of the alleged lack of conformity within a reasonable time after it ought to have discovered the alleged lack of conformity.**

Article 39 of the CISG states that "[a] buyer loses the right to rely on a lack of conformity of the goods if he does not give notice to the seller specifying the nature of the lack of conformity within a reasonable time after he has discovered it or ought to have discovered it." CISG, Art. 39. A buyer bears the burden of showing that notice of nonconformity has been given within a reasonable time. (Parties not reported), No. 3/13 O 3/94, Landgericht Frankfurt am Main, Germany (July 13, 1994), UNILEX 1994. The evidence shows that, shortly after Beacon discovered the ribs were "off condition" and did not "look good," both Northam and Chicago Prime were notified of a potential

problem. Chicago Prime therefore received notice within a reasonable time after Northam discovered the problem; however, the question here is whether Chicago Prime was notified within a reasonable time after Northam *should have discovered* the problem.

A court in Italy found that the reasonableness of the time for a notice of non-conformity provided in Article 39 is strictly related to the duty to examine the goods within as short a period as is practicable in the circumstances set forth in Article 38. *See Sport D'Hiver di Genevieve Culet v. Ets Louys et Fils*, No. 45/96, Tribunale Civile di Cuneo, Sez. I, Italy (Jan. 31, 1996), UNILEX 1996. The court further noted that when defects are easy to discover by a prompt examination of the goods, the time of notice must be reduced. *Id. See also* Rizzieri, *supra*, 20 J.L. & Com. at 215 ("The time when the buyer ought to have discovered the defect should be determined by reference to Article 38, under which '[t]he buyer must examine the goods, or cause them to be examined, within a short a period as is practicable in the circumstances . . . .'"). As discussed above, Dr. Maltby reported that the putrid condition of the meat was apparent even in its frozen state. (Dr. Maltby's Report at 3; Tr. 305.)

Because this court has found that Northam failed to examine the shipment of ribs in as short a period of time as is practicable, it follows that Northam also failed to give notice within a reasonable time after it should have discovered the alleged non-conformity.

In summary, the object of the CISG in requiring inspection in as short a period of time as is practicable, and notice promptly thereafter, is to avoid controversies such as this – where, because of the passage of time, the condition of the goods at the time of transfer cannot be reliably established. When that happens, the burden falls on the buyer, who had the opportunity to inspect the goods, but failed to do so.

*Damages*

The final matter before court is the award of damages. In its Amended Complaint, Chicago Prime seeks judgment "in the amount of $178,200 plus interest, attorney's fees, costs, and other and further relief as this Court shall deem just and appropriate." (Am. Compl., Count I.)

The CISG provides:

> Damages for breach of contract by one party consist of a sum equal to the loss, including loss of profit, suffered by the other party as a consequence of the breach. Such damages may not exceed the loss which the party in breach foresaw or ought to have foreseen at the time of the conclusion of the contract, in the light of the facts and matters of which he then knew or ought to have known, as a possible consequence of the breach of contract.

CISG, Art. 74. This provision is "designed to place the aggrieved party in as good a position as if the other party had properly performed the contract." *Delchi Carrier SpA*, 71 F.3d at 1029 (quotation omitted). It is undisputed that Chicago Prime's loss is $178,200.00.

The CISG further provides that "[i]f a party fails to pay the price or any other sum that is in arrears, the other party is entitled to interest on it, without prejudice to any claim for damages recoverable under article 74." CISG, Art. 78. Thus, Chicago Prime is clearly entitled to prejudgment interest. However, Article 78 does not specify the rate of interest to be applied or how the rate should be determined; and the parties have not addressed the issue. The court's research has revealed that the interest issue under the CISG has been the subject of great controversy. In fact, "[t]he interest issue, while relatively mundane-sounding, has been the subject of up to 30 percent of total CISG cases worldwide." Tom McNamara, *U.N. Sale of Goods Convention: Finally Coming of Age?*, 32-FEB Colo. Law. 11, 19 (February, 2003) (citation omitted); *see also* Louis F. Del Duca & Patrick Del Duca, *Practice Under the Convention on International Sale of Goods (CISG): A Primer for Attorneys*

*and International Traders (Part II)*, 29 UCC L.J. 99, 157 (1996) (stating that "[42] of the 142 cases reported thus far involve issues as to what interest rate should be applicable to overdue payments or refunds"). One author outlined nine different approaches that courts have used (or authors have suggested) in determining the rate of interest under the CISG, including using the law applicable to the contract in the absence of the CISG, the law of the creditor's place of business, the law of payment currency, trade usages observed in international sale, general principles of full compensation and the law of the forum. *See* Christian Thiele, *Interest on Damages and Rate of Interest Under Article 78 of the U.N. Convention on Contracts for the International Sale of Goods*, http://www.cisg.law. pace.edu/cisg/biblio/thiele. html (updated July 5, 2001). Another author, finding that the current approaches do not fully satisfy the objectives of a default rule (such as international uniformity), suggests that adjudicators should "customize" the rate by awarding the actual borrowing or savings rate or the lending rate in the absence of evidence of borrowing costs. Karin L. Kizer, *Minding the Gap: Determining Interest Rates Under the U.N. Convention for the International Sale of Goods*, 65 U. Chi. L. Rev. 1279, 1302-05 (Fall 1998).

However, because there is no single approach used by all courts and the parties have failed to address the interest issue or provide information necessary to "customize" a rate, this court will award interest according to the principles used by federal courts in determining choice of law issues. It is well-settled that "[a] federal court sitting in diversity jurisdiction must apply the substantive law of the state in which it sits," including its choice of law. *Land v. Yamaha Motor Corp., U.S.A.*, 272 F.3d 514, 516 (7th Cir. 2001) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). *See also Allen & O'Hara, Inc. v. Barrett Wrecking, Inc.*, 964 F.2d 694, 695 n. 3 (7th Cir. 1992) ("In diversity cases, federal courts look to state law to determine the availability of and rules for computing prejudgment

interest.").

In contract disputes, Illinois follows the Restatement (Second) of Conflict of Laws, which refers courts either to a choice of law provision in the contract at issue, or to the place of performance. *Midwest Grain Prods. of Illinois, Inc. v. Productization, Inc.*, 228 F.3d 784, 787 (7th Cir. 2000) (citing *Esser v. McIntyre*, 661 N.E.2d 1138, 1141 (Ill. 1996)). In this case, there is no choice of law provision found in the contract but performance undoubtedly took place in Illinois. The contract was one for the purchase of ribs and the ribs were delivered to Northam's agent in Illinois. "In Illinois, prejudgment interest, whether grounded in a statute or equity, is based on the concept of fairness and is awarded to make the plaintiff whole for the loss of use of money wrongfully withheld." *Platinum Tech., Inc. v. Federal Ins. Co.*, 282 F.3d 927, 933 (7th Cir. 2002) (citing *In re Estate of Wernick*, 535 N.E.2d 876, 888 (Ill. 1989)). The Illinois Interest Act, 815 ILCS § 205, provides a statutory rate of 5% per annum, calculated from the time the money was due under the contract:

> Creditors shall be allowed to receive at the rate of a five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing; on money lent or advanced for the use of another; on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance . . . .

*Id.* § 205/2.

Coincidently, the result of applying Illinois choice of law rules in this case is to apply the law of Illinois, the forum state. Using the forum's interest rate is a common choice in CISG cases, notwithstanding its tension with the CISG's goal of promoting international uniformity. *See* McNamara, *supra*, 32-FEB Colo. Law. at 19 ("In the absence of direction, courts have often awarded interest according to the applicable law of the forum jurisdiction.").

The undisputed contract price for the ribs was $178,200.00, which is evidenced in the Confirmation and the Invoice. Based on the statutory rate of 5% and the finding that $178,200.00 was due under the contract on May 1, 2001, simple prejudgment interest is $27,242.63. Therefore, Chicago Prime is entitled to damages in the amount of $178,200.00 plus prejudgment interest in the amount of $27,242.63.

A claim for attorney's fees is a procedural matter governed by the law of the forum. *Ajax Tool Works, Inc.*, 2003 WL 223187 at *7. The Seventh Circuit recently decided that the term "loss" in Article 74 of the CISG does not include attorney's fees incurred in the litigation of a suit for breach of contract. *Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co., Inc.*, 313 F.3d 385, 389 (7th Cir. 2002). Accordingly, Chicago Prime's claim for attorney's fees is denied.

## CONCLUSION

In accordance with the foregoing Findings of Fact and Conclusions of Law, the Clerk of the Court is directed to enter judgment in favor of the plaintiff Chicago Prime Packers, Inc. and against the defendant Northam Food Trading Co. in the sum of $178,200.00 plus $27,242.63, representing prejudgment interest calculated at a rate of 5% from May 1, 2001, for a total payment of $205,442.63.

IT IS SO ORDERED.

GERALDINE SOAT BROWN
United States Magistrate Judge

DATED: May 21, 2004